BEFORE THE FIRST DIVISION, APRIL 8, 1948

**No. 52255.**—Dixie Supply Co. *v.* United States, protest 122808- K (Laredo).

OLIVER, Presiding Judge: This protest involves the proper classification for duty purposes of certain emblems imported from Mexico which were assessed at a compound rate aggregating 110 percent ad valorem under paragraph 1527 (c) (2), Tariff Act of 1930, as "Articles * * * designed to be worn on apparel or carried on or about or attached to the person, such as and including * * * military * * * ornaments * * *." The importer claims the merchandise to be properly dutiable at 32½ percent ad valorem under paragraph 397 of the tariff act, as modified by the trade agreement with Mexico, T. D. 50797, as "Articles or wares not specially provided for, if composed wholly or in chief value of silver."

The imported articles are shield-like pins sold to and worn by the personnel of the Gulf Coast Air Force as part of their military uniform. Such a pin was a necessary part of the uniform and its wearing was compulsory. The plaintiff was permitted to sell military equipment but was not authorized to manufacture insignia. The plaintiff had the Mexican manufacturers copy an approved sample and it is this product so manufactured in Mexico that is now before us. If these imported pins are military insignia, they are excluded from the provisions of paragraph 1527 (c) (2). If they are military ornaments, they are properly dutiable as classified under paragraph 1527 (c) (2). The issue before us is whether or not these pins are military insignia.

An official sample of the imported articles is in evidence (plaintiff's exhibit 1). (R. 8.) Captain Kenneth Olson, connected with the Adjutant General's Department at the San Antonio Air Service Depot, testified on behalf of the plaintiff that his official files contained copies of directives regulating the production and use of military insignia. He stated that exhibit 1 is known as a distinctive insigne (R. 15). Two letters or directives taken from official files were introduced in evidence; one, a letter to commanding officers and all Air Force detachments, dated June 17, 1942, from the Headquarters Office of the Commanding General at Randolph Field, Texas, regarding the use of a certain insigne, attached to which there was a photograph of the insignia permitted under such directive, was received in evidence as illustrative exhibit F; the other letter, dated May 1, 1942, giving a portion of a directive relating to military insignia, also from the Gulf Coast Air Force Headquarters entitled "Circular No. 70, Uniform Regulations," prescribing distinctive insignia for wear by all personnel by the command at Randolph Field, was received in evidence as illustrative exhibit G (R. 86).

On cross-examination, the witness stated that he did not know whether or not the merchandise before us is similar in all material respects to the merchandise

prescribed in the directives (R. 31); that he does not know whether or not it is of equal workmanship or of equally good material; that the insignia referred to in the directives *must* be worn by the military personnel in the advanced flying school at Kelly Field, Tex., in accordance with Circular No. 70, and "Army Regulations 600–40" (R. 32); that the regulations require distinctive insignia to be worn by units when so directed; that at times it is compulsory for an officer to purchase certain insignia which the enlisted man receives as part of his general issue. He then stated that exhibit 1 would be required for general issue (R. 33) and that anyone outside of this particular training area would have no reason to wear the insigne. He stated that an insigne is "anything that distinguishes a person one from another" (R. 43).

Abe Kenneth Fisch, called as a witness for the plaintiff, testified that he was engaged as a jobber of general merchandise for 5 years, handling military insignia, novelties, and military wearing apparel. A photostatic copy of a certificate granted by the War Department to sell military insignia was introduced in evidence as plaintiff's illustrative exhibit A (R. 11). The witness stated that during the time the involved importations were made he held a similar certificate of authority; that when such certificate was obtained, he signed an agreement (plaintiff's illustrative exhibit B) with the War Department to sell only to authorized military personnel insignia such as a Medal of Honor, Distinguished Service Cross, etc., and that when he sold to his dealers he demanded a similar certificate of authority (R. 13). The witness further testified that he handled over one million military insignia of various kinds and that from his experience in the business he knew what an official Gulf Coast insigne was and that the one in issue is an official insigne (R. 51). He further stated that he purchased thousands of Gulf Coast area insignia of this type in this country from the Albin Manufacturing Co., Rhode Island, and that in ordering those insignia he would order the official Gulf Coast area insigne and that the insignia sent to him were identical to that before us; that he personally ordered these insignia from the Mexican manufacturer; that he used as a sample in such ordering, a sample from the Albin Manufacturing Co. (R. 55); and that the present importations were made from such sample.

The witness stated that he would not sell such merchandise to just anybody who might want to buy it but that he sold same only to authorized dealers, Army post exchanges, and Quartermaster Supply officers; that the sales to the dealers were to those who had a certificate of authority from the Adjutant General's office similar in nature to the certificate offered in evidence and that proof of the issuance of such certificate to a dealer was required before sale of merchandise (R. 58); that he also maintained a soldiers' retail store and had secured a certificate of authority as a retail dealer. The witness further testified that when an enlisted man came to his retail store to purchase an insigne, he had a slip from his commanding officer showing that he was entitled to wear that insigne; that the slip was examined, and if in order, the insigne was sold and the buyer then signed a book with his name and serial number; and that his practice was to sell only to military personnel in the Gulf Coast area. He stated that he personally observed thousands of these Gulf Coast area insignia being worn by military personnel.

The witness stated that there is a difference between a military ornament and a military insigne; that a military ornament is a piece of jewelry worn by a woman whereas a military insigne is a regulation insigne worn by military personnel. Plaintiff's illustrative exhibit D, which witness testified is understood in the trade as a military ornament, was received in evidence, as was plaintiff's illustrative exhibit E, having a military design on it of some character. The witness stated that in the military supply business there are a great number of items that are

referred to as military ornaments (R. 65) and that they are of similar character to illustrative exhibits D and E.

On cross-examination the witness stated that in addition to handling military supplies he deals in all types of ladies' and men's jewelry, luggage, and various other merchandise; that he sold merchandise similar to exhibit 1 to post exchanges and also sold jewelry; that a post exchange sells articles other than military insignia; that articles known as military jewelry or military ornaments are sold in the trade and that such merchandise is similar to illustrative exhibits D and E; that he sold discharge buttons; that everyone is permitted to sell them but everyone cannot wear them; that they are never referred to in the trade as military ornaments or military jewelry or military insignia (R. 67); that it was necessary to get the approval of the War Department before he offered merchandise similar to exhibit 1 for sale, but that it was *not* necessary to submit the merchandise to the War Department to ascertain if it met the requirements; that based upon his business experience, exhibit 1 conforms to the quality of workmanship and material required by the War Department for this type of an item (R. 69); that exhibit 1 is identical in design to that called for in the directive and photograph (plaintiff's illustrative exhibit F); that the pin introduced in evidence as defendant's exhibit 2 for identification, which the Government contended was in compliance with the directive, was not identical in design with exhibit 1; that exhibit 2 for identification does not conform to the photograph attached to the directive (R. 74) and the overall size of exhibit 2 for identification is much smaller than exhibit 1; that exhibit 2 for identification does not have a "cut-out" as prescribed by the regulations and that it "is not regulation" (R. 75).

The witness stated respecting the samples that exhibit 1 was "the poorest sample of the lot." Certain other samples taken from the shipment in issue were received in evidence as plaintiff's exhibits 3 and 4. He stated that he did not know of his own knowledge whether or not an enlisted man in the Gulf Coast area had to have and wear an insigne as represented by exhibit 1 (R. 81). A photostatic copy of the insigne referred to was introduced in evidence as plaintiff's illustrative exhibit H. Counsel for the respective parties hereto agreed that there is no question about this merchandise being in chief value of silver (R. 85).

On being recalled as a witness on the Government's behalf, the witness, Fisch, admitted that he did not have authority to manufacture Army insignia but merely had authority to sell insignia; that he did not ascertain whether the Mexican manufacturers were authorized to make Army insignia; that he did not furnish the manufacturer with War Department dies but that he "furnished facsimiles," i. e., a pin manufactured by an authorized dealer (R. 105); that he did not obtain approval from the Secretary of War as to these importations (R. 106).

Examples of military insignia, which the witness testified were official and sold only to military personnel and which are similar in character to the instant emblems with respect to their use, were introduced in evidence as collective illustrative exhibit 5 (R. 112); two other items, which the witness testified are miniature copies of official emblems and not worn by military personnel but were used in the military supplies trade for jewelry and ornamental purposes to be worn by wives, sweethearts, and friends of men in the service, were introduced in evidence as collective illustrative exhibit 6 (R. 113). A sample of the insigne pin approved by the Army Air Forces Advance Flying School, Kelly Field, Texas, was received in evidence as defendant's collective illustrative exhibit 8.

J. L. Toohey, Colonel, U. S. Army, testified on behalf of the defendant that for nearly 2 years he was assistant personnel officer at the Gulf Coast Command, Randolph Field, Tex., in charge of personnel records; that the directive, dated June 17, 1942 (plaintiff's illustrative exhibit F), did not require the military

personnel in the Gulf Coast Headquarters to wear pins described therein as a part of their uniform; but that in his capacity as Acting Assistant Adjutant General, he had authorized Circular No. 70 (plaintiff's illustrative exhibit G), under which directive it was required that Army personnel in the Gulf Coast Air Force Training Center wear, as a necessary part of their uniforms, a pin like collective illustrative exhibit 8, which, except for the fact that it is imperfect in that the enamel is broken, is a regulation pin (R. 132). In answer to a query by the court concerning the distinction made by military authorities between military insignia and military ornaments, the following testimony was adduced (R. 134):

Judge LAWRENCE: Colonel Toohey, in military parlance, did you recognize a distinction between military insignia and military ornaments designed to be worn on a person?

The WITNESS: In general, yes. There might be some border-line cases where it would be hard to tell that. Anything that would indicate a man's unit, his rank, or anything so specific as that would be insignia.

Judge LAWRENCE: Military ornaments may be chiefly of metal, may they not?

The WITNESS: It would be possible, yes.

Judge LAWRENCE: Are epaulets ornaments or insignia?

The WITNESS: Epaulets would be ornaments, I should say.

Judge LAWRENCE: Are epaulets military ornaments or insignia?

The WITNESS: I'd like to explain that. I should say that epaulets were ornaments rather than insignia, comparable to the black stripe that general officers wear on their overcoats. It indicates only a type of rank, not a specific rank.

The witness further testified that Army regulations prohibited the manufacture of military insignia by anyone who was not specifically authorized to do so (R. 135) and that he would not accept as regulation any insignia that he knew to be made by an unauthorized person (R. 139) no matter how perfect the articles might be. Defendant offered in evidence a copy of an Army regulation governing the wearing of the service uniform and two copies of regulations covering the manufacture, sale, and possession of military equipment and insignia (defendant's collective exhibit 9) which the witness stated were substantially in effect during the period covered by the involved importation.

Upon interrogation by the trial judge, the witness, Colonel Toohey, stated that the samples in collective illustrative exhibit 6, i. e., the two samples of miniature insignia, would not be regarded by him as military insignia (R. 144). With respect to the bearing that variation in the quality of military insignia would have on the question of official approval, the following colloquy took place between counsel and Government's witness, Colonel Toohey, at page 147:

X Q. And, have you had occasion to observe during your career a number of different military insignia of different types, Colonel?—A. Yes, I have.

X Q. There would be some variations in quality and in the various items, would there not?—A. Yes, I suppose so. Seems to me I have seen some with the color worn off of them. It is probably that the quality varies.

X Q. You wouldn't consider that that possible variation in quality would bear on the official character of the pin, would it Colonel?—A. I don't think so. Of course, that is outside of the Adjutant General's concern.

The Government contends, first, that the merchandise imported was not essential as part of the military regalia or uniform of the soldier and that, even assuming that these particular insignia were made as an essential part of the equipment of a soldier, still, if they are inferior in quality and do not comply with the directive, such articles would not fall under the classification of military insignia. It further contends that it is pertinent to consider (R. 137) whether pins manufactured by other than an authorized manufacturer should be classified as regulation Army paraphernalia, and maintains that insignia made by unauthorized manufacturers should not be regarded as military insignia for want of proper authorization, even though such insignia meet the specifications of Army directives.

The importer, on the other hand, maintains that the articles at bar were manu-

factured, sold, and worn by enlisted personnel as military insignia, and that if the articles manufactured comply with the specifications of the directives, that would be controlling so as to classify them as military insignia despite the lack of authorization.

Both this court and our appellate court have held that military insignia and vocational articles are not dutiable under the provisions of paragraph 1527 (c), Tariff Act of 1930, and predecessor paragraphs of prior tariff acts, but are dutiable as articles, not specially provided for, according to the particular metal or material from which they are made., (*United States* v. *Horstmann Co.*, 14 Ct. Cust. Appls. 443, T. D. 42079; *United States* v. *Gaunt*, 15 Ct. Cust. Appls. 94, T. D. 42183; *Meadows Wye & Co., Inc., et al.* v. *United States*, 19 Cust. Ct. 105, Abstract 51825.)

In the case of *United States* v. *Horstmann Co.*, *supra*, involving saber chains which were shown to be an essential part of the equipment of a military officer, made such by military regulations, our appellate court, in holding that they were not covered by the predecessor paragraph 1428, Tariff Act of 1922, stated:

\* \* \* Such articles may be of utility or of adornment, or they may possess both of these qualities; but, unless they are designed to be worn or carried, or attached to the person for mere personal comfort, convenience, or adornment, they can not be classified under the provisions in question.

and again,

\* \* \* The chains in question are vocational articles; and while chains are *eo nomine* provided for \* \* \* these are not the kind intended to be covered by that designation.

In the *Gaunt* case, *supra*, metal buttons and badges of various sizes, which were prescribed by the military regulations of the United States for use on the dress uniforms of the enlisted men and commissioned officers of the Army, Navy, and Marine Corps, were classified by the collector as articles designed to be worn on apparel or carried on or about or attached to the person under the predecessor paragraph 1428, Tariff Act of 1922. Our appellate court, in holding the buttons and badges to be vocational articles or insignia prescribed by military regulations, stated that such articles are not worn alone for personal comfort, convenience, or adornment but that "The enlisted man or commissioned officer wears them because he must, because the law of the land so requires, and not to satisfy some whim or fancy of his own." The appellate court therein held that the articles were excluded from the provisions of paragraph 1428 and that they were properly dutiable under paragraph 399, Tariff Act of 1922, as "metal articles not specially provided for \* \* \*."

We are of the opinion that the evidence adduced herein fairly establishes that the pins here are military insignia as that term is contemplated. The record indicates that apparently thousands of like insignia sold to military personnel throughout the particular area by post exchanges and stores were worn by them as part of the regulation uniform without any objection to their sale on the part of the War Department or commanding officers. We can assume that the latter had knowledge of the proper insignia required to be worn and failure to prohibit the sale of the articles at bar leads us to the conclusion that such articles were manufactured, sold, and worn as military insignia. Whether the articles were authorized or only permitted to be worn seems to us to be immaterial. The fact remains that only military personnel could and did wear them and they were worn according to prescribed regulations. Even if these Gulf Coast emblems were not required to be worn, but were only authorized for wear, they are still not articles designed to be worn on apparel or carried on or about or attached to the person, but are vocational articles, and, therefore, are precluded from classification under paragraph 1527 (c) (2). *N. S. Meyer, Inc.* v. *United States*, 52 Treas. Dec. 511, Abstract 3513.

We are further of the opinion that the question of authorization to make the articles at bar is not germane to the classification of the merchandise and that if the articles meet the specifications in the directives, that is sufficient to hold them classifiable as military insignia. The failure to obtain proper authorization to manufacture the articles might be a violation of Army regulations which would subject the manufacturer to penalties imposed by governmental enforcement agencies, but it does not change the essential nature of the thing manufactured and could in no way affect classification for customs purposes. As observed by the trial judge, page 150:

Judge LAWRENCE: It is possible that an unauthorized manufacturer could produce a superior article to one which could be produced by an authorized manufacturer? Is it not?

The WITNESS: Yes.

An examination of the samples in evidence would seem to support the plaintiff's claim. The record shows that the articles manufactured in Mexico were similar to those military articles manufactured in this country under proper authorization and that there was no substantial variation in the articles at bar from the specifications of the directives. The weight of the testimony conclusively shows that the pins in question are distinctive insignia which only a soldier in the Gulf coast area would be permitted to wear.

We hold, therefore, that the plaintiff has overcome the presumption attaching to the correctness of the collector's classification and that the articles at bar are properly dutiable at 32½ percent ad valorem under paragraph 397 of the Tariff Act of 1930, as modified by the trade agreement with Mexico, T. D. 50797, as "articles or wares not specially provided for, if composed wholly or in chief value of silver."

The protest is, therefore, sustained. Judgment will be entered accordingly.